579 A.2d 774

Rudeara BAILEY

v.

STATE of Maryland.

No. 791, Sept. Term, 1989.

Court of Special Appeals of Maryland.

Sept. 26, 1990.

Certiorari Denied Dec. 4, 1990.

James C. Savage, Assigned Public Defender, Rockville (Jay Seirmarco, Washington, D.C., on the brief), for appellant.

Ann N. Bosse, Asst. Atty. Gen. (J. Joseph Curran, Jr., Atty. Gen., both of Baltimore, and Hugh Carter Vinson, State's Atty. for Dorchester County, Cambridge, on the brief), for appellee.

Argued before GILBERT, C.J., and MOYLAN, and GARRITY, JJ.

MOYLAN, Judge.

The appellant, Rudeara Bailey, was convicted by a Dorchester County jury, presided over by Judge Donald F. Johnson, of first-degree felony-murder. Upon this appeal, she raises the following five contentions:

1. That the State's use of peremptory challenges to strike black jurors offended the Equal Protection Clause of the Fourteenth Amendment;

2. That the evidence was not legally sufficient to support the conviction;

3. That Judge Johnson erroneously failed to give a limiting instruction about the use of a defense witness' prior inconsistent statement;

4. That Judge Johnson erroneously failed to grant the appellant a change of venue; and

5. That Judge Johnson erroneously quashed the subpoena for the assistant state's attorney who was prosecuting the case.

The appellant contends initially that the State so used its peremptory challenges as to violate the appellant's rights under the Equal Protection Clause of the Fourteenth Amendment as interpreted and implemented by *Batson v. Kentucky,* 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986). The appellant is black. The murder victim was white. The State used seven of its ten peremptory challenges to strike prospective jurors who were black. It used the other three challenges to strike prospective jurors who were white. The jury that was ultimately seated consisted of eight white and four black jurors.

### The Batson Threshold

Judge Johnson ruled against the appellant on this issue in alternative ways. He ruled initially that the appellant had failed to make out a *prima facie* case of purposeful discrimination:

"I don't think that the defense has made a *prima facie* case for purposeful discrimination in the selection of the petit jury solely on the evidence concerning the number of blacks that were stricken by him."

He then ruled, by way of an alternative "backup" position, that even if a *prima facie* case had, *arguendo*, been made out, the State had nonetheless come forward with an adequate explanation for its use of the peremptories.[1]

Our holding is that Judge Johnson was neither clearly erroneous nor clearly abusive of his discretion in his threshold finding and ruling that the appellant had not established a *prima facie* case of racial discrimination and that the State, therefore, was under no obligation to come forward with racially neutral explanations for its use of peremptories.

The use of peremptory challenges in a racially discriminatory fashion is an invidious practice and our constitutional law has provided stern and sure measures for dealing with it. That same constitutional law is also carefully calibrated to guarantee that charges of racial discrimination, calling into play the full strictures of *Batson*, are neither carelessly indulged nor promiscuously invoked. This is why *Batson* requires that the appellant establish a *prima facie* case of discrimination at the threshold before full constitutional mobilization takes place. That is why the elaborate re-

---

1. By way of considered *dicta*, we note our agreement with Judge Johnson's "backup" position that the State came forward with racially neutral explanations for its challenges. The seven prospective jurors who were challenged knew the appellant personally, most of them on a speaking basis, or knew the appellant's mother and aunt, both of whom testified as defense witnesses. Prospective juror Alfredia Mae Jackson was a classic illustration. She had known the appellant since the appellant was a girl and remembered that she "was such a nice person and I knew her family well." She indicated that, "Deep down in my heart I feel, I don't feel she is guilty, deep down in my heart." The other jurors who were challenged were, to be sure, not this close with the appellant, but all of them knew her and/or her family. The prosecutor had good reason to strike these jurors, and the reason had nothing to do with race. We decline to go into greater detail, lest we blur the focus on Judge Johnson's primary ruling and our affirmance thereof.

sponses of *Batson* are not intended to be a knee-jerk reaction every time a charge of discrimination is laid.

In speaking of that initial burden that a defendant must shoulder to trigger the larger inquiry, *Batson* was clear, at 476 U.S. 96–97, at 106 S.Ct. 1723:

> "In deciding whether the defendant has made the requisite showing, the trial court should consider all relevant circumstances. For example, a 'pattern' of strikes against black jurors included in the particular venire might give rise to an inference of discrimination. Similarly, the prosecutor's questions and statements during voir dire examination and in exercising his challenges may support or refute an inference of discriminatory purpose. These examples are merely illustrative."

In *Stanley v. State*, 313 Md. 50, 60, 542 A.2d 1267 (1988), Judge Adkins analyzed in depth the nature of this threshold showing:

> "Although the phrase 'prima facie case' 'may be used by courts to describe the plaintiff's burden of producing enough evidence to permit the trier of fact to infer the fact at issue,' in the Title VII context (and by implication, the *Batson* context), the phrase denotes 'the establishment of a legally mandatory, rebuttable presumption.' [*Texas Department of Community Affairs v.*] *Burdine*, 450 U.S. [248] at 254 n. 7, 101 S.Ct. [1089] at 1094 n. 7, 67 L.Ed.2d [207] at 216 n. 7 [1981]. Also *see* B. Garner, *A Dictionary of Modern Legal Usage* 434 (1987) (citing *Burdine* for 'prima facie case')."

In *Batson*, the Supreme Court "explained the operation of prima facie burden of proof rules" by reference to its cases dealing with "disparate treatment" under Title VII of the Civil Rights Act of 1964. It explained, at 476 U.S. 94 n. 18 at 106 S.Ct. 1721–22 n. 18:

> "Our decisions concerning 'disparate treatment' under Title VII of the Civil Rights Act of 1964 have explained the operation of prima facie burden of proof rules. See *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93

S.Ct. 1817, 36 L.Ed.2d 668 (1973); *Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981); *United States Postal Service Board of Governors v. Aikens*, 460 U.S. 711, 103 S.Ct. 1478, 75 L.Ed.2d 403 (1983). The party alleging that he has been the victim of intentional discrimination carries the ultimate burden of persuasion. *Texas Dept. of Community Affairs v. Burdine*, supra [450 U.S.], at 252–256, 101 S.Ct. 1089 [at 1093–95], 67 L.Ed.2d 207."

### *The Standard of Appellate Review of the Threshold Ruling*

The determination of whether that threshold has been crossed is entrusted to the trial judge. In reviewing the trial judge's decision, appellate courts do not presume to second-guess the call by the "umpire on the field" either by way of *de novo* fact finding or by way of independent constitutional judgment. It is the trial judge who enjoys the immeasurably superior vantage point to sense the mood and to catch the tone of the entire proceeding. *Batson* voiced its confidence in and deference to the trial judge's decision, at 476 U.S. 97 at 106 S.Ct. 1723:

"We have confidence that trial judges, experienced in supervising voir dire, will be able to decide if the circumstances concerning the prosecutor's use of peremptory challenges creates a prima facie case of discrimination against black jurors."

It is the trial judge who is in close touch with the racial mood, be it harmonious or be it tense, of the local community, either as a general proposition or with respect to a given trial of high local interest. The trial judge is positioned to observe the racial composition of the venire panel as a whole, a vital fact frequently not committed to the record and, therefore, unknowable to the reviewing court. The trial judge is able to get the "feel" of the opposing advocates—to watch their demeanor, to hear their intonations, and to spot their frequently unspoken purposes. It is a total process in which nonverbal communication may often

be far more revealing than the formal words on the type-written page. The standard of review, therefore, is per-force that of whether the trial judge's fact finding as to this threshold showing is clearly erroneous. (Or, perhaps, since it is the ruling itself which is being reviewed, the standard of review is the quantitatively indistinguishable clear abuse of discretion standard.) Whichever the standard, *Stanley v. State*, at 313 Md. 60, 542 A.2d 1267, echoed the Supreme Court's confidence in the trial judge's special competence in monitoring the *voir dire:*

> "The Supreme Court was confident that trial judges, experienced in supervising voir dire, would 'be able to decide if the circumstances concerning the prosecutor's use of peremptory challenges creates a prima facie case of discrimination against black jurors.'"

*See also Tolbert v. State*, 315 Md. 13, 16, 553 A.2d 228 (1989).

That the nature of the role of the trial judge on this issue is essentially a fact-finding one was confirmed by *Stanley v. State*'s holding, at 313 Md. 61, 542 A.2d 1267, based upon *Batson* and the Title VII cases, that the defendant's burden on this issue of racial discrimination is one of ultimate persuasion:

> "Further examination of *Batson* and the Title VII cases has convinced us that the defendant has the ultimate burden of persuading the court there has been intentional racial discrimination."

In referring specifically to the initial burden of establishing to the satisfaction of the trial judge the existence of a *prima facie* case, *Stanley v. State* pointed out that the appropriate burden of persuasion was that of a preponder-ance of the evidence, saying at 313 Md. 71, 542 A.2d 1267:

> "It simply requires the defendant to prove by a prepon-derance of the evidence that the peremptory challenges were exercised in a way that shifts the burden of produc-tion to the State and requires it to respond to the rebut-

table presumption of purposeful discrimination that arises under certain circumstances." [2]

In the *Stanley* opinion's companion case of *Trice v. State*, the Court of Appeals had the benefit of the trial judge's finding as to the existence of a *prima facie* case and affirmed that finding, at 313 Md. 83–84, 542 A.2d 1267, as being not clearly erroneous:

"Judge Buchanan, when the defense objection was raised, asked the State to explain the reasons for its strikes. This was at least an implied finding of the existence of a prima facie case of discrimination.... Nor can we say that Judge Buchanan's implicit finding was clearly erroneous." (Citations omitted).

*Mathematical Proof of a Pattern of Discrimination*

The appellant is asking us, as a matter of law, to overturn Judge Johnson's fact finding as clearly erroneous (or his ruling as a clear abuse of discretion), solely on the mathematical basis that seven out of ten of the prosecutor's peremptory challenges were directed at black prospective jurors. The appellant argues not that this is sufficient proof of a *prima facie* case, but that it is compelling proof.[3]

---

**2.** At first blush, there appears to be a self-contradiction within *Stanley v. State* when it, at 313 Md. 71, 542 A.2d 1267, proceeds to "exercise ... independent constitutional judgment" with respect to the establishing of a *prima facie* case in one of the two companion cases dealt with by that opinion. The necessity for that independent judgment becomes clear, however, when the Court reveals that it had no choice but to make its own judgment because it was "impossible to tell from these remarks whether the judge was attempting to make a *Batson* prima facie case ruling." 313 Md. at 70, 542 A.2d 1267. In dealing with its companion case of *Trice v. State,* however, the *Stanley* opinion reverts unmistakably to the "clearly erroneous" standard of review of the trial judge's *prima facie* ruling.

**3.** *Tolbert v. State,* 315 Md. 13, 18, 553 A.2d 228 (1989), dealt with the very different situation where the State's use of four out of four peremptories against black prospective jurors was held to be *sufficient evidence to permit the finding* that a *prima facie* case of discrimination had been established. "[T]he clear implication ... was that the court believed that Tolbert had met his burden to make a *prima facie* showing of racial discrimination.... We share the confidence of the

The appellant's thesis is that the use of "70% of the prosecutor's peremptories" against members of a given group is *ipso facto* proof of a pattern of discrimination, that such a finding is not merely permitted but compelled.[4] In certain circumstances, of course, it might be, but it is by no means necessarily so. The problem with her mathematical argument is that the appellant has given us one term of an ostensible proportion without giving us the other.

There is a critical difference between *a pattern* in the abstract and *a pattern of discrimination.* To extrapolate *a pattern of discrimination* solely from a statistical analysis of the peremptory challenges would require not only knowledge of the percentage of strikes used against a given group but also knowledge of the percentage that that group represented of the total venire panel—or, more precisely, of the percentage that that group represented of the prospective jurors actually called forward to be accepted or challenged. A pattern of suggested discrimination would emerge from the disproportionately heavy employment of peremptories against a target group out of line with what

---

Supreme Court that trial judges are able to decide whether the circumstances create such a prima facie case.... We cannot say that the trial judge was wrong in so determining."

For illustrative cases affirming the trial judge's ruling that no *prima facie* case of discrimination had been established, *see United States v. Dennis,* 804 F.2d 1208 (11th Cir.1986); *Commonwealth v. McKendrick,* 356 Pa.Super. 64, 514 A.2d 144 (1986); *Wilder v. State,* 498 N.E.2d 1295 (Ind.App.1986). For illustrative cases affirming the trial judge's decision that a *prima facie* case had been established, *see Fleming v. Kemp,* 794 F.2d 1478 (11th Cir.1986); *United States ex rel. Kyles v. O'Leary,* 642 F.Supp. 222 (N.D.Ill.1986); *Mincey v. State,* 180 Ga.App. 263, 349 S.E.2d 1 (1986), *aff'd* 256 Ga. 636, 353 S.E.2d 814 (1987).

4. *Stanley v. State,* at 313 Md. 87, 542 A.2d 1267, spoke of the significance of pertinent evidence on this issue in terms of its being *sufficient to permit* the finding of a *prima facie* case as *a matter of fact,* not in terms of its being so *decisive and overwhelming as to compel* such a finding as *a matter of law:*

"Like the majority of courts that have considered the question, we believe that when the State uses peremptories in a manner that assures that *no* blacks will serve on a jury that is to try a black defendant, it is at least permissible to conclude that a prima facie case of discrimination has been made out." (Emphasis in original).

random selection would predict, given the statistical make-up of the venire panel as a whole, would happen to the group simply by the law of averages.

If, for instance, a venire panel were 100 per cent white, every peremptory would be directed at a member of the white race, but no pattern of racial discrimination would be indicated. Conversely, if an entire venire panel were black, the 100 per cent employment of peremptories against blacks would not suggest a pattern of racial discrimination. It would suggest a pattern, to be sure, but self-evidently not a pattern of racial discrimination.

In the intermediate ranges, if 70 per cent of the peremptories were directed against members of a group that represented only 20 per cent of the total panel, that percentage of peremptory strikes would, standing alone, suggest a pattern of discrimination. If, on the other hand, 70 percent of the peremptory challenges were used against members of a group that represented 90 per cent of the total panel, that would be a contraindication of discrimination. Indeed, it would indicate that 30 per cent of the challenges had been used against some other racial group that represented only 10 per cent of the available targets. If, finally, 70 per cent of the peremptories were directed at members of a group that represented 70 per cent of the total panel, that would, standing alone, indicate nothing other than statistically predictable random selection at work.

We cannot assess whether there has been a disproportionate use of peremptories so as to give rise to an inference of discrimination unless we have two numbers or two percentages to work with. Proportionality by definition is the relationship between two quantities, not one in a vacuum.[5] There are, of course, other ways of demonstrating a *prima*

---

5. Significantly, *Stanley v. State,* at 313 Md. 72, 542 A.2d 1267, based its conclusion that a *prima facie* case of discrimination had been established not upon the single factor that the State had used 80 per cent of its challenges to strike black prospective jurors but upon the combination of factors that the State had "used 80 percent of its strikes to remove blacks who constituted less than 25 percent of the venire."

*facie* case of the racially discriminatory use of peremptory challenges. We are concerned here, however, only with the probative impact of statistics standing alone. We need to know, therefore, whether the ratio between the percentage of targets struck and the percentage of targets available to be struck was less than, equal to, or greater than "one."

On this proposition—that a *prima facie* case of racial discrimination has necessarily been established as a matter of law simply by the fact that seven of ten peremptories were used against blacks—the appellant's data is fatally incomplete. The record does not reflect and we do not know what the percentage of blacks was of the venire panel as a whole or of the group of prospective jurors who were called forth to be challenged or accepted.

### The Allocation of The Burden of Proof

As with every appeal, we begin with the presumption that the trial judge ruled correctly. The burden, as always, is upon the appellant who alleges error to convince us that error occurred. A part of that burden is the making of an adequate record.[6] *Parker v. State*, 72 Md.App. 610, 617, 531 A.2d 1313 (1987). Statistically, this record tells us nothing. As *Stanley v. State* pointed out, at 313 Md. 61, 524 A.2d 1267, "It is the defendant's burden to make that prima facie showing." "Initially, the burden is on the defendant to establish a prima facie case." *State v. Gorman*, 315 Md. 402, 410, 554 A.2d 1203 (1989).[7] With respect

---

**6.** It was of this requirement of an adequate record that *Stanley v. State* spoke, at 313 Md. 70 n. 11, 524 A.2d 1267:
> "We emphasize here the need for the record to contain not only specific findings by the judge, but also information to support those findings; information such as the numbers of blacks and whites on the venire, the numbers of each stricken for various reasons, the reasons underlying strikes for cause, pertinent characteristics of jurors excluded and retained, relevant information about the race of the defendant, the victim, and potential witnesses, and so forth."

**7.** Although they were dealing with a pre-*Batson* standard, the cases of *Lawrence v. State*, 295 Md. 557, 571, 457 A.2d 1127 (1983), and *Evans v. State*, 304 Md. 487, 526–527, 499 A.2d 1261 (1985), offer some

to this burden, we ourselves observed in *Chew v. State,* 71 Md.App. 681, 694, 527 A.2d 332 (1987):

> "Initially, the burden is on the party claiming an equal protection violation to establish a *prima facie* case in that regard.
> The Supreme Court stated, at 476 U.S. at 93, 106 S.Ct. at 1721, 90 L.Ed.2d at 85:
>
>> 'As in any equal protection case, the "burden is, of course," on the defendant who alleges discriminatory selection of the venire "to prove the existence of purposeful discrimination." '
>
> Absent the establishment of such a *prima facie* case, there is no obligation on the opposing party to offer any explanation for the use of a peremptory challenge and no entitlement on the part of the moving party to a hearing on the issue."

Under the circumstances, we cannot say that Judge Johnson was clearly erroneous (or clearly abused his discretion) in determining that the appellant failed to establish a *prima facie* case of the racially discriminatory use of peremptory challenges by the State.

### Other Contentions

■ The remaining contentions will not detain us long. We have reviewed the trial testimony thoroughly and do not hesitate to hold that the evidence was sufficient to support the conviction. It is not necessary to rehearse that evidence in elaborate detail. The robbery and murder victim was Mrs. Helen Dyott, an insurance agent who was collecting premiums at the time of her robbery and murder. The principal in the first degree was the appellant's boyfriend, Clifton Dobbins. Extensive evidence established that the murder occurred in the appellant's apartment. Several witnesses saw the victim enter the appellant's apartment.

---

general guidance with respect to the burden upon the defendant to establish to the satisfaction of the trial judge the existence of a *prima facie* case of racially discriminatory use of peremptory challenges.

Several witnesses placed the appellant in the appellant's apartment at approximately the same time. One witness actually saw the appellant standing in the window of her apartment and beckoning Mrs. Dyott to enter.

One witness testified that the appellant told her that Clifton Dobbins had robbed and murdered "the insurance lady." The appellant also acknowledged to one of the State's witnesses that she was aware of Clifton Dobbins' plan to rob Mrs. Dyott although she had not anticipated that he would ultimately kill her. The evidence was clearly sufficient to permit the reasonable inference that the appellant was a participant with Clifton Dobbins in the plan to rob Mrs. Dyott. She was, therefore, also responsible for the murder that resulted from that robbery.

■ During the examination of State's witness Joyce Banks, the State questioned Ms. Banks about an earlier statement she had given to the police. It appears that the earlier statement may have been used for the purpose of refreshing the recollection of the witness, who subsequently testified in conformity with the statement. In either that capacity or as a prior inconsistent statement, the appellant does not now and did not then object to its admission. The appellant claims error only in the failure of Judge Johnson to give, *sua sponte*, a limiting instruction. The short answer to the contention is that the appellant never requested such an instruction. Nothing in this regard is, therefore, preserved for appellate review.

■ The appellant fails to make a persuasive argument with respect to her request for a change of venue because of prejudicial pretrial publicity. The appellant presented articles that had appeared in several local newspapers as well as clips from several radio broadcasts. Judge Johnson conducted a hearing at which he reviewed the various exhibits and considered such alternative remedies as trial delay and *voir dire* examination. He explained his ruling as follows:

"I have reviewed these articles, and for the most part do not find that they are prejudicial to the defendant in this in any event. The court does not feel that the defense has at this time shown that the pretrial publicity in and of itself has been so massive and widespread that it is clearly prejudicial, or that the publicity has been so inherently prejudicial that it saturated the community and that the remedial step of *voir dire* would be meaningless.

Since the court does not find that pretrial publicity to be so massive and widespread and so inherently prejudicial, it is going to deny the motion at this point.

However, according to what [the prosecutor] has told the court, Mr. Dobbins' case is scheduled for trial in the very near future. And, if there are in fact articles generated in the local media as a result of that trial then, [defense counsel], you may wish to request the court to reconsider its decision.

Additionally, during examination of jurors, if it appears that the prospective jurors would not be able to give Ms. Bailey a fair and impartial trial, then the court would reconsider.

I would point out that the *voir dire* examination is usually a sufficient mechanism to assure that a person does obtain a fair and impartial trial despite the pretrial publicity.

\* \* \* \* \* \*

So as I said, there could be more information available to you gentlemen and it could be brought to the attention of the court. The court may reconsider, it could possibly change its decision. But at this time the court is denying your motion."

The *voir dire* examination that was ultimately conducted in this case gave no indication that it was not a fully efficacious means of guarding against any possible prejudice. We see no abuse of the broad discretion that is vested in the trial judge in ruling on this matter. *Smith v. State*, 51 Md.App. 408, 415, 443 A.2d 985 (1982); *Waine v. State*, 37 Md.App. 222, 227, 377 A.2d 509 (1977).

■ The appellant also complains that Judge Johnson committed reversible error when he granted the State's motion to quash a subpoena that had been issued for Deputy State's Attorney Michael Maloney, who prosecuted the case against the appellant. The subpoena, of course, is only a means of bringing a potential witness into court. The Deputy State's Attorney was in court for the entire trial without benefit of subpoena. Judge Johnson indicated that if, during the course of the trial, it became necessary for the defense to call Mr. Maloney, the court's action in quashing the subpoena by no means precluded the appellant's prerogative in calling the prosecutor as a defense witness. Judge Johnson indicated that he would rule upon the propriety of such a request if and when it was made. In the last analysis, nothing happened in the course of the trial that caused the appellant to make such a request. The issue is moot.

JUDGMENT AFFIRMED; COSTS TO BE PAID BY APPELLANT.