74 A.3d 844

**Khaliq KHAN**

v.

**STATE of Maryland.**

**No. 2715, Sept. Term, 2011.**

Court of Special Appeals of Maryland.

Sept. 4, 2013.

556

558

Julia C. Schiller (Paul B. DeWolfe, Public Defender, on the brief) Baltimore, MD, for appellant.

Daniel J. Jawor (Douglas F. Gansler, Atty. Gen., on the brief) Baltimore, MD, for appellee.

Panel: WRIGHT, MATRICCIANI, CHARLES E. MOYLAN, JR. (Retired, Specially Assigned), JJ.

MATRICCIANI, J.

On June 30, 2011, Khaliq Khan was indicted in the Circuit Court for Montgomery County on two counts of sex offense in the third degree and two counts of second degree assault. These charges were the result of Khan's alleged assault of two girls in a cosmetics store where Khan worked as a security guard. After a jury trial, Khan was found guilty of one count of second degree assault and found not guilty of all other

charges. On February 8, 2012, Khan was sentenced to five years' incarceration, with all but sixty days suspended, and placed on supervised probation for three years upon release. Khan subsequently noted this timely appeal.

## Questions Presented

Appellant presents four questions, which we have rephrased as follows:

I. Did the trial court err in reseating a white male juror, struck by the defense, on the basis of a *Batson* challenge?

II. Did the trial court err in permitting the State to present evidence of prior customer complaints against appellant?

III. Did the trial court err in allowing the State to question appellant regarding possible racial prejudice held by appellant?

IV. Did the trial court err in *voir dire* by asking potential jurors whether they would be biased by the charges against appellant, without attributing that potential bias to "strong feelings?"

For the reasons that follow, we answer no to each question and affirm the judgment of the circuit court.

## Factual and Procedural History

### Background

On March 27, 2011, Khaliq Khan was working as a security guard at Ulta, a cosmetics store in downtown Silver Spring, when twelve-year-old Joie Gadsden and thirteen-year-old Jazmyn Parker came into the store. Gadsden and Parker entered the store to look around while Gadsden's parents were in a nearby bookstore. According to testimony by both Gadsden and Parker, Khan called the girls over to show them perfume. Both girls testified that Khan sprayed perfume on them, including on their chests, and had the girls smell each other. Gadsden testified that during this encounter Khan grabbed her waist and squeezed her buttocks, and Parker

testified that Khan touched both of their buttocks when they began to leave. Gadsden and Parker reported this encounter to Gadsden's parents, who returned to the store and called the police. An officer from the Montgomery County Police Department was dispatched to the store and arrested appellant. Khan was charged with two counts of third degree sex offense and two counts of second degree assault and brought to trial in the Circuit Court for Montgomery County.

### Jury *Voir Dire*

During *voir dire*, the court asked the following question:

[T]he State claims that the defendant, Mr. Khan, had sexual contact with two minors. Is there any member of the panel who, by reason of the nature of the charges, that is to say, by reason of what he's alleged to have been, to have done, will be unable to listen fairly and impartially?

There were no affirmative responses. After the court finished questioning jurors, defense counsel objected to the form of the above question:

The time that I remembered that Your Honor asked it, you used "based on this allegation, does anybody, would anybody be unable to be fair," or something along those lines. And so, the question that I would, that we had asked in our voir dire is, "does it arouse strong feelings?"

The court overruled the defense's objection, stating that the question asked by the court was sufficient to discover any bias from potential jurors owing to the alleged crimes.

### *Batson* Challenge

During jury selection for Khan's trial, the court noted that the defense had exercised five of its seven peremptory strikes against white men. After asking defense counsel to provide race- and gender-neutral reasons for each strike, the court was dissatisfied with counsel's proffer in regard to one potential juror, number 95, and so reseated this juror. Defense counsel explained the peremptory strike against juror 95 as follows:

[G]enerally for him, Your Honor, it was he's an attorney with the federal government. The way he dressed. The way that his grooming was. It was, to me, again, somebody that was very conservative. It had nothing to do with the fact that he was a male or white. It was just the conservative sense[.]

Defense counsel went on to state:

But I'm talking about my vision and my judgment of the way he dresses, the way he grooms, the way he carries himself, he strikes me as a conservative type person.... I'm conservative in many ways. I'm not sure I'm a good juror....

After a discussion regarding this juror, and each of the others, the court concluded:

... the only one I'm finding pretextual is 95, because the others, based on the record, I accept the explanations, not withstanding the five out of seven pattern. I'm going to reseat 95.

Following the court's ruling, defense counsel continued to assert that his reasons for the strike were not pretextual, to which the judge responded: "I think you're being candid. I just don't have to buy it."

### "Bad Acts"

During appellant's cross-examination of Georgia Kalapothakos, the manager of the store where appellant worked, defense counsel asked about her opinion of appellant as a worker:

Q: What would you say, how would you describe Mr. Khan as a worker at the store?

[At this point, the prosecution objected and was overruled.]

A: ... He was reliable. He was always early. He—

Q: Were you pleased with his work?

A: Yes. Overall, yes.

Following this cross-examination, the prosecution asked for a ruling from the court that this testimony "opened the door" for the prosecution to ask Kalapothakos about a customer

complaint. The State sought to establish that the complaint was the impetus for a conversation Kalapothakos had with appellant regarding the boundaries and duties of a security guard—a conversation she had previously testified about during the prosecution's direct examination. The prosecution reasoned that the testimony regarding Kalapothakos's "overall" satisfaction with appellant's work "opened the door" to testimony about problems that had arisen in appellant's work history. The court ruled that such testimony would be allowed, and during the prosecution's redirect examination of Kalapothakos, she testified that her aforementioned discussion regarding a security guard's boundaries had resulted from a customer complaint. During this testimony, Kalapothakos never testified about the details of the complaint.

Appellant, appellant's wife, and appellant's stepson also discussed this complaint. Appellant's wife, Chanaz Khan ("Mrs. Khan"), acknowledged that she was aware of the prior complaint, though from her testimony she appeared not to have known its details. Appellant's stepson, Asman Nasir ("Mr. Nasir"), testified that he had no knowledge of the prior complaint. During the prosecution's cross-examination of appellant, he was asked whether he remembered the conversation he had with Kalapothakos regarding his boundaries and duties as a security guard, and whether he remembered a prior complaint from a customer regarding appellant "touching her." The court allowed the above testimony, ruling that the prosecution was allowed to respond to the character evidence and issues introduced by the defense.

### Testimony Regarding Racial Prejudice

At trial, Khan testified that Gadsden and Parker had made him nervous, that he intended to "occupy" them to prevent them from misusing products in the store, and that he never intended to offend or touch either girl inappropriately. On direct examination, appellant provided the following response to a question about his duties at the store:

> You go according to the books, because the neighborhood of that Silver Spring will, I mean, not a discrimination, but

over there you cannot control the (unintelligible) if you don't have all type of, if you go according to the books, okay, they will play it like that.

During the State's cross-examination, appellant was asked to clarify what he meant by his comment "not a discrimination." [1] During this line of questioning, the prosecution asked appellant if his comment was in regard to the high number of African Americans in the area of the store. The prosecutor also alluded to the incident in question and asked whether "[t]wo African American 12 year olds looking at . . . perfume made [appellant] nervous[.]" Appellant responded affirmatively to this last question, but he stated throughout his testimony that he was not referring to prejudice against any particular race in his initial remark.

A jury found Khan guilty of one count of second degree assault and acquitted him of the other charges. On February 8, 2012, Khan was sentenced to five years of confinement, with all but sixty days suspended, and placed on supervised probation for three years upon release. Following his sentencing, Khan noted this timely appeal.

## DISCUSSION

### I.

Appellant first contends that the circuit court erred in finding defense counsel's race- and gender-neutral explanation for one of its peremptory strikes to be pretextual. For the reasons explained below, we do not agree that the circuit court committed reversible error in reseating this juror.[2]

---

1. Appellant is not a native English speaker, and an interpreter was used to assist with some questions.

2. In appellant's brief, he states that the circuit court also denied improperly his later motion to reconsider the court's reseating of this juror. However, the substance of appellant's argument concerns the judge's finding of pretext made during jury selection.

 Even if appellant's argument that the court denied improperly his motion to reconsider were made in full, there was no error. Defense counsel, after jury selection, noted to the court that juror 95 stared at

 Parties in a criminal trial cannot use a peremptory challenge to strike a potential juror based on the juror's race. *Batson v. Kentucky,* 476 U.S. 79, 99, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986). The Supreme Court has made clear that the use of peremptory strikes on the basis of race is unconstitutional not only when exercised by the prosecution, but also when exercised by a defendant in a criminal trial. *Georgia v. McCollum,* 505 U.S. 42, 55, 112 S.Ct. 2348, 120 L.Ed.2d 33 (1992). Though *"Batson* challenges" originally were used to challenge the striking of black jurors, purposeful discrimination against white jurors is also an impermissible use of a peremptory challenge. *Gilchrist v. State,* 340 Md. 606, 624–45, 667 A.2d 876 (1995). Additionally, the use of peremptory challenges to strike a juror on the basis of gender is impermissible. *Tyler v. State,* 330 Md. 261, 266, 623 A.2d 648 (1993).

 The Supreme Court has laid out a three-part analysis by which a trial court should examine a party's use of peremptory challenges if contested as unconstitutionally discriminatory. *Purkett v. Elem,* 514 U.S. 765, 767–68, 115 S.Ct. 1769, 131 L.Ed.2d 834 (1995). First, the trial court must determine whether a *prima facie* case of racial discrimination against potential jurors exists. *Id.* If such a finding is made, the party exercising the peremptory strikes must present a race-neutral explanation for each strike. *Id.* The trial court must then decide whether purposeful discrimination has occurred. *Id.*

---

him the "entire time" during the jury's oath. After a lengthy discussion regarding this and the previous explanation offered by defense counsel for its strike of juror 95, the judge stated that he would "carefully observe the jury" as the trial progressed, and asked counsel to raise the issue again if something additional came up. After the first day of testimony, defense counsel again raised this issue, to which the judge responded that he had been observing this juror and did not believe him to seem "any different than any other juror." Therefore, we note that the judge did in fact reconsider appellant's arguments regarding juror 95, but found defense counsel's additional explanation regarding the juror's demeanor to be without merit based on his own observations.

█ "In reviewing [a] trial judge's [*Batson* ] decision, appellate courts do not presume to second-guess the call by the 'umpire on the field' either by way of *de novo* fact finding or by way of independent constitutional judgment." *Bailey v. State,* 84 Md.App. 323, 328, 579 A.2d 774 (1990). Therefore, in examining a *Batson* challenge, this court reviews the trial judge's findings using a clearly erroneous standard of review. *Id.* at 329, 579 A.2d 774. *See also Hernandez v. New York,* 500 U.S. 352, 364, 111 S.Ct. 1859, 114 L.Ed.2d 395 (1991) ("In *Batson* we explained that the trial court's decision on the ultimate question of discriminatory intent represents a finding of fact of the sort accorded great deference on appeal. . . .").

Appellant takes issue with the circuit court's application of the second and third steps in its *Batson* analysis. He argues that the race- and gender-neutral reasons proffered by his counsel for striking juror 95 were believable, and that because the trial judge acknowledged that counsel was being "candid," the court's finding of pretext was clear error. We disagree.

█ In completing the second step of a *Batson* analysis, the question is only whether the reasons offered for the peremptory strike are race-neutral. This step "does not demand an explanation that is persuasive, or even plausible." *Purkett,* 514 U.S. at 768, 115 S.Ct. 1769. It is true that the reasons offered by defense counsel for the use of a peremptory strike against juror 95 appear to be race- and gender-neutral. Defense counsel noted that his reasons for striking this juror were based on the conservative appearance of the juror and the fact that the juror was a government attorney. Appellant argues that because these reasons proffered for striking juror 95 were facially valid and race- and gender-neutral, they should be accepted. This is not the final step in a *Batson* analysis, however, and it does not necessarily establish that the strikes were proper. In *Gilchrist v. State,* 340 Md. 606, 667 A.2d 876 (1995), defense counsel proffered as his reasons for one challenged peremptory strike the fact that the juror was wearing a blazer and khaki slacks and was a student with sixteen years of education—not unlike the explanation at

issue in the present case. In *Gilchrist,* the Court of Appeals held that the trial court was "warranted in holding that these reasons were pretextual." 340 Md. at 628, 667 A.2d 876. Therefore, it is clear that an explanation that is race- and gender-neutral and an accurate description of the juror is not alone sufficient to withstand a *Batson* challenge. The explanation must not be *pretextual. Id.*

Thus, appellant's real argument is focused on the third step of the *Batson* analysis: whether the circuit court erred in finding that these race- and gender-neutral reasons for striking this juror were pretextual, and whether the circuit court therefore erred in finding purposeful discrimination in this strike. For each of the other white male jurors who were struck, defense counsel offered reasons for his exercise of peremptory strikes which generally consisted of characteristics that defense counsel had noted on paper prior to the *Batson* challenge being raised. These characteristics included the juror's age, the fact that the juror's spouse was a homemaker, the fact that the juror was closely related to law enforcement, and for one juror the fact that he was a statistician. None of these explanations fit juror 95, prompting defense counsel's explanation that juror 95 was a young, conservative-looking attorney working for the government. Given these circumstances, the trial court believed this explanation to be pretextual.

▮▮▮▮ The judge's statement here that he believed that defense counsel was being "candid" does not indicate error in the judge's ruling. The fact that the court believed defense counsel was partially motivated by certain characteristics he observed does not mean that the court was required to exclude the challenged juror. The trial court's determination is whether "intentional discrimination was a *substantial or motivating factor* in the decision to exercise the strike."[3]

---

**3.** The federal circuits have split in their analyses of *Batson* challenges in which both race-based and race-neutral reasons have motivated peremptory strikes. Some circuits have adopted the "mixed-motive" test:

[W]here both race-based and race-neutral reasons have motivated a challenged decision, a supplementary analysis applies. In these situations, the Court allows those accused of unlawful discrimination to prevail, despite clear evidence of racially discriminatory motivation, if they can show that the challenged decision would have been made even absent the impermissible motivation, or, put another way, that the discriminatory motivation was not a "but for" cause of the challenged decision.

*Cook v. LaMarque*, 593 F.3d 810, 814 (9th Cir.2010) (quoting *Kesser v. Cambra*, 465 F.3d 351, 372 (9th Cir.2006)). *See also, e.g., Gattis v. Snyder*, 278 F.3d 222, 232–35 (3d Cir.2002); *Wallace v. Morrison*, 87 F.3d 1271, 1274–75 (11th Cir.1996) (per curiam); *Jones v. Plaster*, 57 F.3d 417, 420–22 (4th Cir.1995); *United States v. Darden*, 70 F.3d 1507, 1530–32 (8th Cir.1995); *Howard v. Senkowski*, 986 F.2d 24, 27–30 (2d Cir.1993).

Although the Supreme Court is aware of the "mixed-motives" test, it has not adopted a specific stance beyond the basic rule of law in *Batson*. In *Snyder v. Louisiana*, 552 U.S. 472, 485–86, 128 S.Ct. 1203, 170 L.Ed.2d 175 (2008), the Court noted that it has held, in non-*Batson* scenarios:

> Once it is shown that a discriminatory intent was a substantial or motivating factor in an action taken by a state actor, the burden shifts to the party defending the action to show that this factor was not determinative. We have not previously applied this rule in a *Batson* case, and we need not decide here whether that standard governs in this context.

Thus, the "substantial motivating factor" language from *Batson* remains the prevailing standard, and it does not require a specific causative analysis. *See Cook*, 593 F.3d at 814–15.

Although we are not the final authority on this matter, we would echo the Ninth Circuit Court of Appeals' observation that the mixed-motives test presents severe conceptual problems. *Id.* at 814–15. The Supreme Court itself "alluded to the difficulty of determining on collateral review which of the prosecutor's motives were 'but for' causes." *Id.* at 815 (citing *Snyder*, 552 U.S. at 485–86, 128 S.Ct. 1203).

More importantly, we doubt that a trial court could actually make such a subtle causal distinction in any given trial. The mixed-motives test applies by definition when "*both* race-based and race-neutral reasons have *motivated* a challenged decision." *Cook*, 593 F.3d at 814 (emphases added). If equal protection is violated only when the challenger's race-based reason was a but-for cause of the challenge, then the race-*neutral* reason for a challenge must have been an *insufficient* cause, standing alone (otherwise, the race-based reason could not be a causative factor). Thus, the entire mixed-motive analysis is premised upon the challenger's race-neutral reason being *a motivating* factor, but somehow not motivating *enough* to cause the strike when the race-based reason is "subtracted" from the decision to challenge. As a practical matter, we cannot imagine how a trial court could make such a determination, and as a constitutional matter, we believe it is fair to disallow a strike where racial bias plays *any* part in the decision to strike a juror.

*Jones v. Plaster,* 57 F.3d 417, 420–21 (4th Cir.1995) (emphasis added) (citing *Hernandez,* 500 U.S. at 359, 111 S.Ct. 1859). Immediately after acknowledging defense counsel's candor, the judge stated "I just don't have to buy it." Therefore, it is clear from the record that the circuit court ultimately was not persuaded by defense counsel's explanation and that it believed purposeful discrimination had been a substantial factor in the striking of juror 95.

As a reviewing court, we give the trial court's finding "great deference." *Bridges v. State,* 116 Md.App. 113, 134, 695 A.2d 609 (1997) ("The trial judge is able to get the 'feel' of the opposing advocates-to watch their demeanor, to hear their intonations, and to spot their frequently unspoken purposes." (quoting *Bailey v. State,* 84 Md.App. 323, 328, 579 A.2d 774 (1990))). In the present case, the trial court noted a pattern of strikes against white male jurors, and the explanation proffered for the defense's strike against juror 95 was offered when his previously-noted explanations for this series of strikes did not apply to this juror. The explanation given was different from any of the other explanations accepted by the trial court. Given these circumstances, we do not see clear error in the court's finding that this particular explanation was pretextual and that purposeful discrimination had occurred.[4]

---

Although we would not hold trial courts to the mixed-motives test, the present case ultimately does not *require* us to resolve this constitutional question, for even if the mixed-motive analysis were required—or merely permitted—under *Batson,* neither side raised the issue at trial. There is no record from which we could potentially reconstruct a but-for causation analysis, and whether the trial court should have employed a mixed-motives analysis was not preserved for our review.

4. Appellant cites *Miller–El v. Dretke,* 545 U.S. 231, 125 S.Ct. 2317, 162 L.Ed.2d 196 (2005), for the proposition that an appellate court must make a more extensive inquiry into a race- and gender-neutral explanation offered for a peremptory strike when a *Batson* ruling is contested. But *Miller–El* merely reaffirmed the holding in *Batson* that a challenger may rely on "all relevant circumstances" to raise an inference of purposeful discrimination, *Miller–El,* 545 U.S. at 240, 125 S.Ct. 2317 (quoting *Batson,* 476 U.S. at 96–97, 106 S.Ct. 1712); it does not require any additional inquiry beyond what was contemplated in *Batson:*

## II.

Appellant next argues that testimony regarding a prior customer complaint was inadmissible "prior bad acts" evidence, and that because the circuit court erroneously ruled that appellant "opened the door" to the State's questions, the court should not have admitted testimony on that subject from appellant, his manager, and his wife and stepson.

According to the testimony of several witnesses, the prior complaint was from a customer who alleged that appellant inappropriately touched her, but it was never verified.[5] Appellant contends that this evidence was inadmissible as a "bad act" under Maryland Rule 5–404(b). "[A] bad act is an activity or conduct, not necessarily criminal, that tends to impugn or reflect adversely upon one's character, taking into consideration the facts of the underlying [trial]." *Sifrit v. State*, 383 Md. 116, 134, 857 A.2d 88 (2004) (quoting *Klauenberg v. State*, 355 Md. 528, 547, 735 A.2d 1061 (1999)). Rule 5–404(b) states that "[e]vidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith." Evidence of prior acts *is* admissible, however, for other purposes, such as proof of motive, opportunity, intent, common scheme or plan, knowledge, or absence of mistake or accident. Md. Rule 5–404(b);

---

"Once the defendant makes a prima facie showing, the burden shifts to the State to come forward with a neutral explanation for challenging ... jurors" within an arguably targeted class. *Id.*, at 97, 476 U.S. 79, 106 S.Ct. 1712. Although there may be "any number of bases on which a prosecutor reasonably [might] believe that it is desirable to strike a juror who is not excusable for cause ..., the prosecutor must give a clear and reasonably specific explanation of his legitimate reasons for exercising the challeng[e]." *Id.*, at 98, n. 20, 106 S.Ct. 1712 (internal quotation marks omitted). "The trial court then will have the duty to determine if the defendant has established purposeful discrimination." *Id.*, at 98, 106 S.Ct. 1712. *Miller–El*, 545 U.S. at 239, 125 S.Ct. 2317. So while the trial court was *free* to consider additional facts, it was not *required* to do so, *sua sponte*. If appellant had more to offer by way of argument or evidence, he should have done so—or at least attempted to do so—at trial.

5. Evidence was never presented regarding the details of the complaint, or to show that the incident in fact occurred.

*Behrel v. State,* 151 Md.App. 64, 125, 823 A.2d 696 (2003) (citing *Merzbacher v. State,* 346 Md. 391, 407, 697 A.2d 432 (1997)) (noting that exceptions listed in Rule 5–404(b) are not exclusive, but only representative).

 We need not delve into the intricate standard of review for prior bad acts,[6] because the subject of the disputed testimonies in this case was not, in fact, a prior bad act. Instead, the witnesses' testimonies concerned only a *complaint* about a prior, unspecified act, which was relevant in each instance.

 First, Kalapothakos's testimony was relevant according to the "open door" doctrine, which "is based on principles of fairness and permits a party to introduce evidence that otherwise might not be admissible in order to respond to certain evidence put forth by opposing counsel." *Mitchell v. State,* 408 Md. 368, 388, 969 A.2d 989 (2009) (citing *Conyers v. State,* 345 Md. 525, 545, 693 A.2d 781 (1997)). "If one party has introduced irrelevant evidence, over objection, or, indeed, even 'admissible evidence which generates an issue,' the trial court may rule that the first party has 'opened the door' to evidence offered by the opposing party that

---

**6.** When deciding whether evidence of prior bad acts is admissible, a trial court must determine whether such evidence fits within an exception to Md. Rule 5–404(b), then decide whether such acts are established by clear and convincing evidence, and finally weigh the probative value of such evidence against any undue prejudice as a result of its admission. *State v. Faulkner,* 314 Md. 630, 634–35, 552 A.2d 896 (1989). While no deference is given to the trial court in the determination of the first of these three steps, an appellate court reviews the second step to determine if "the evidence was sufficient to support the trial judge's finding," and the third step is reviewed using an abuse of discretion standard. *Id.*

An attempt to apply this standard of review shows the flaw in appellant's argument that, because the State never proved that he had touched a customer, there was no clear and convincing evidence of the admitted evidence. The State did not inquire as to whether appellant *had in fact previously touched customers inappropriately.* Rather, the witnesses' testimony was only that a *complaint had been made,* and it was elicited specifically to refute relevant evidence presented by the defense. Given that both appellant and his manager acknowledged the prior complaint had been made, there was nothing further to prove.

previously would have been irrelevant, but has become relevant." *Mitchell*, 408 Md. at 388, 969 A.2d 989 (quoting L. McLain, *Maryland Evidence*, § 103:13(c)(i)). The doctrine "is implicated when a party seeks to respond to the other party's evidence with either (1) evidence which is competent, or (2) evidence which is similar to the adversary's evidence which was ruled competent *over objection.*" *Clark v. State*, 332 Md. 77, 87, 629 A.2d 1239 (1993) (emphasis in original). This doctrine is narrow, and a response to the issues injected by the adverse party should be tailored appropriately. *Donaldson v. State*, 416 Md. 467, 493, 7 A.3d 84 (2010) (citing *Mitchell*, 408 Md. at 389, 969 A.2d 989). Furthermore, this evidence may also be excluded if a court finds that "its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Md. Rule 5–403; *Clark*, 332 Md. at 87, 629 A.2d 1239 (citing Fed.R.Evid. 403).

■■■ On direct examination, the prosecution asked only whether Kalapothakos had a prior conversation with appellant regarding the boundaries and duties of a security guard. The scope of that question was limited to the fact that this discussion occurred, and not the impetus for it. On cross-examination, it was *defense* counsel who raised the issue of appellant's past work in general by asking how Kalapothakos would "describe him as a worker" and whether she was "pleased with his work." In response to these questions, Kalapothakos answered that appellant was "reliable" and that she was pleased with his work "overall." This testimony regarding appellant's past work performance—elicited by the defense over objection—"opened the door" for the State to clarify Kalapothakos's statement that she was pleased with appellant's work "overall" by asking whether she had been informed of any specific misconduct.

■■■ Second, the testimony of the remaining witnesses about the prior complaint was relevant to impeach evidence of

appellant's character for truthfulness. Md. Rule 5–608(a)(4); Md. Rule 5–616(a)(3). During the defense's direct examination of Mrs. Khan, she testified that her husband was "very honest at his job [and] at home. . . ." Following this testimony, the prosecution asked the court to allow questioning regarding Mrs. Khan's knowledge of the prior complaint against appellant from a customer, arguing that whether appellant had discussed this incident with his wife was relevant to his honesty, a character issue about which Mrs. Khan had testified. Similarly, appellant's stepson, Mr. Nasir, was asked by defense counsel to testify about appellant's honesty, to which he responded: "Truthful, trustworthy, good moral character, and a man of integrity." The prosecution, during cross-examination, asked Mr. Nasir whether appellant had told him about the prior customer complaint, to which Mr. Nasir responded that he had not. The State's purpose of this line of questioning was evident from its follow-up question: "Now that you know about that, does that change your opinion about his honesty in any way?" Finally, appellant initially denied there having been prior customer complaints against him, making the complaint relevant as direct impeaching evidence. Md. Rule 5–616(a)(2).

While the proverbial door was opened to the disputed testimony, it remained for the trial court to balance its probative value against its prejudicial nature, *see* Rule 5–403, and here we see no abuse of discretion. The evidence in question was not presented to prove that an untoward incident *actually had occurred*, and the complaint's substance was never addressed in detail. The testimony elicited from Kalapothakos during the State's redirect examination was narrowly tailored to respond to her testimony during the defense's cross-examination. As soon as the State attempted to elicit testimony regarding the *details* of the prior complaint, defense counsel's objections were sustained. Kalapothakos did not discuss the details of this complaint; her testimony was only that a complaint had been made. Similarly, neither Mrs. Khan nor Mr. Nasir testified as to *details* of the prior complaint. Mrs. Khan acknowledged that she was aware of the prior complaint

against her husband, but she did not know the details of its substance, and that was the end of the State's inquiry. The prosecution asked appellant's stepson, Mr. Nasir, whether appellant had told him about the prior customer complaint, to which Mr. Nasir responded that he had not. Given the context of the witnesses' testimonies and their limited scope, appellant suffered no undue prejudice requiring reversal.

## III.

■■■ Appellant next argues that the trial court erred in allowing the prosecution to question him regarding racial prejudice. We review whether such evidence was admissible under an abuse of discretion standard. *Robinson v. State*, 151 Md.App. 384, 394, 827 A.2d 167 (2003) ("It is ordinarily within the sound discretion of the trial court to determine the admissibility of evidence." (citing *Conyers v. State*, 354 Md. 132, 176, 729 A.2d 910 (1999))). Though we agree with appellant that evidence of racial prejudice is generally inadmissible and caution against its use, we conclude that there was no reversible error in the case before us.

Appellant cites *Eiler v. State*, 63 Md.App. 439, 492 A.2d 1320 (1985), to argue that evidence of a criminal defendant's racial prejudice is inadmissible. In *Eiler*, the prosecution asked the defendant to explain how he had described a particular neighborhood in a previous hearing. *Id.* at 451, 492 A.2d 1320. During this testimony, the prosecution quoted extensively from the defendant's testimony in a previous trial, where the defendant had referred to the neighborhood in question as "Spade Area," then explained that by "Spade Area" he meant "colored," and stated that "[being called spade] is better than being called black or colored. . . . " *Id.* at 452, 492 A.2d 1320. On appeal, the Court of Special Appeals held that the prosecutor's cross-examination of the defendant regarding the defendant's testimony in a previous hearing was "prejudicial, irrelevant, and collateral" to the case. *Id.* at 454, 492 A.2d 1320.

The present case is distinguishable from *Eiler* for two reasons. First, because of the context of the questioning in the present case, the evidence here was not "irrelevant" and "collateral" in the same way as the evidence at issue in *Eiler*. Additionally, appellant's testimony here, taken as a whole, was not as prejudicial as the testimony in *Eiler*. We explain.

In *Eiler*, the prosecution introduced racially-charged testimony from the defendant's prior trial. In the present case, however, appellant himself had testified about the store's neighborhood, and he made a follow-up comment that he did not intend to sound discriminatory. This vague testimony left considerable room for misinterpretation, and the State's questioning was a relevant attempt to clarify these comments. Appellant's remarks pertaining to "discrimination" and how this affected his conduct as a security guard were relevant to the case, because in appellant's testimony he attempted to explain his conduct toward both girls by testifying that they made him nervous and that he therefore sought to engage and "occupy" them. *See Thomas v. State*, 143 Md.App. 97, 111, 792 A.2d 368 (2002) ("Generally, evidence is relevant and admissible if it tends either to establish or disprove issues in the case." (citing *Snyder v. State*, 361 Md. 580, 591, 762 A.2d 125 (2000))); *Snyder*, 361 Md. at 592, 762 A.2d 125 ("[T]he relevancy determination is not made in isolation. Instead, the test of relevance is whether, in conjunction with all other relevant evidence, the evidence tends to make the proposition asserted more or less probable." (citing *Spector v. State*, 289 Md. 407, 434, 425 A.2d 197 (1981))). In short, the fact that the prosecution was attempting to clarify *appellant's* own remarks made previously in the same trial distinguishes the testimony here from that in *Eiler*, in which the *prosecution* injected issues of racial prejudice by asking the defendant to testify about remarks made *prior* to his current trial.

Furthermore, we note that the testimony in the present case does not appear to be as racially charged as that in *Eiler*. In *Eiler*, the prosecution quoted extensively testimony from the defendant's previous trial and repeated the defendant's racial slurs. Therefore, the defendant's racial prejudice was in

fact demonstrated by the evidence at issue, potentially creating jury "prejudice, hostility, or sympathy." *Eiler*, 63 Md. App. at 453, 492 A.2d 1320. This stands in contrast to the present case, in which appellant—in responding to the prosecutor's questions—repeatedly clarified that he had not been referring to any "race" or "particular segment of people" but rather people "overall" when he made his comment regarding discrimination.

Therefore, while we caution against questioning similar to that at issue in this case, the evidence elicited here was relevant to appellant's prior testimony and did not cause unfair prejudice. For these reasons, the admission of this evidence at trial was not an abuse of discretion.

## IV.

Appellant's final argument is in regard to the following question asked at *voir dire:*

[T]he State claims that the defendant, Mr. Khan, had sexual contact with two minors. Is there any member of the panel who, by reason of the nature of the charges, that is to say, by reason of what he's alleged to have been, to have done, will be unable to listen fairly and impartially?

Appellant argues that the trial court erred because this question did not ask potential jurors whether the crime might arouse "strong feelings" causing bias against the defense. We disagree.

In reviewing a trial court's *voir dire* rulings, we examine the record "as a whole for an abuse of discretion, that is, questioning that is not reasonably sufficient to test the jury for bias, partiality, or prejudice." *Stewart v. State*, 399 Md. 146, 160, 923 A.2d 44 (2007) (citing *White v. State*, 374 Md. 232, 243, 821 A.2d 459 (2003)). "The scope of voir dire and the form of questions propounded rest firmly within the discretion of the trial judge." *Stewart*, 399 Md. at 159, 923 A.2d 44 (citing *Curtin v. State*, 393 Md. 593, 603, 903 A.2d 922 (2006)). The primary purpose of *voir dire* is "to ensure a fair and impartial jury by determining the existence of cause for

disqualification." *State v. Logan*, 394 Md. 378, 396, 906 A.2d 374 (2006) (citing *State v. Thomas*, 369 Md. 202, 207, 798 A.2d 566 (2002)). Refusal by the trial court to ask a question regarding "a specific cause for disqualification" constitutes an abuse of discretion. *State v. Shim*, 418 Md. 37, 45, 12 A.3d 671 (2011) (quoting *Moore v. State*, 412 Md. 635, 654, 989 A.2d 1150 (2010)). Specific causes include biases related to the defendant, witnesses, or the crime. *Shim*, 418 Md. at 45, 12 A.3d 671 (citing *Dingle v. State*, 361 Md. 1, 10, 759 A.2d 819 (2000)).

Appellant cites *State v. Thomas*, 369 Md. 202, 798 A.2d 566 (2002), and *Sweet v. State*, 371 Md. 1, 806 A.2d 265 (2002), to argue that a trial court abuses its discretion when it denies a defendant's request to include the words "strong feelings" in a *voir dire* question targeting juror bias from the nature of the crime alleged. We do not believe that such a literal reading of these cases is accurate. In both of these cases, as well as the more recent case *State v. Shim*, the Court of Appeals held that a question aimed at uncovering the bias of potential jurors based on the defendant's alleged crimes must be asked if requested. In *Shim*, the court wrote: "we recognize today that the potential for bias exists in most crimes, and thus we will require *voir dire* questions which are targeted at uncovering these biases." 418 Md. at 54, 12 A.3d 671. The court noted that a question targeted at biases related to the crime must be asked "regardless of the crime." *Id.*

We believe that the *voir dire* question that *was* asked in the present case was sufficiently "targeted at uncovering these biases." *Id.* Appellant's contention is solely based on the absence of two words: "strong feelings." We do not believe that, simply because the requested questions in *Thomas, Sweet,* and *Shim* happened to contain these two words, their presence was a *necessary* part of the court's holdings in those cases. In *Thomas*, on which appellant relies, the trial court had refused to ask a question targeting biases related to the crime, stating that he had covered the requested question through other questions asked during *voir dire*. In holding

that the questions asked by the trial court were not sufficient, the Court of Appeals noted that the question to which the trial judge was referring was a "general voir dire question" and that it had previously "cautioned against the use of such questions to ascertain bias of a specific kind. . . ." *Thomas,* 369 Md. at 214, 798 A.2d 566. Therefore, the issue in *Thomas,* as well as *Sweet* and *Shim,* was the *absence* of a question specifically targeting biases based on the crime, not the *form* of such a question that *was* asked.

 When a required question is asked, and the objection is related to the form of the question asked, we will give great deference to the trial court. *Stewart,* 399 Md. at 159, 923 A.2d 44 ("The scope of voir dire and the form of questions propounded rest firmly within the discretion of the trial judge." (citing *Curtin,* 393 Md. at 603, 903 A.2d 922)). The court in *Shim* was asked to determine whether the defense's requested question targeting bias based on the alleged crime was too broad, as it contained the language "violent death," rather than "murder" or "the criminal charges in this case." The *Shim* court held that such a departure from the general question targeting bias based on the crime was acceptable, explaining as follows:

> To hold differently . . . would make *voir dire* an exercise in semantics and a minefield for criminal defendants and the State. We decline to make such fine distinctions or create more uncertainty. A proposed *voir dire* question need not be in perfect form, and the court is free to modify the proposed question as needed.

*Shim,* 418 Md. at 55, 12 A.3d 671 (citing *Casey v. Roman Catholic Archbishop,* 217 Md. 595, 606, 143 A.2d 627 (1958)).

To find reversible error in the failure to include "strong feelings" in the *voir dire* question before us would similarly be an exercise in mere semantics. Moreover, as the State persuasively argues, the question asked at *voir dire* was *more* favorable to the defendant, because it did not frame bias as defendant solely on "strong" feelings. As a broader question, it potentially excluded *more* jurors unfavorable to the defense,

and any error was therefore not prejudicial to appellant. The court's question asking if the nature of the charges against appellant would prevent any jurors from listening "fairly and impartially" fulfills the requirement laid out in *Thomas, Sweet,* and *Shim,* and creates "a reasonable assurance that prejudice would be discovered if present." *Stewart,* 399 Md. at 159, 923 A.2d 44 (citing *White,* 374 Md. at 242, 821 A.2d 459). Therefore, reversal is not required here.

**JUDGMENT OF THE CIRCUIT COURT FOR MONTGOMERY COUNTY AFFIRMED. COSTS TO BE PAID BY APPELLANT.**